Mississippi State Highway Commission *v.* Howard, et al.

No. 43573 June 14, 1965 176 So. 2d 294

*Welch, Gibbes & Graves,* Laurel, for appellant.

558

*Deavours & Hilbun,* Laurel, for appellees.

JONES, J.

This case was tried in the County Court for the Second Judicial District of Jones County, Mississippi, and resulted in a verdict in favor of appellees in the sum of $25,500. On appeal to the circuit court of said district, the judgment was affirmed and the cause now comes here. We affirm the case.

The Highway Commission filed suit for the condemnation of 18.55 acres and 3.85 acres, the larger acreage being for the construction of a new interstate highway, and the 3.85 acres for an access or frontage road along said highway.

The Howards owned 180 acres of land 3.6 miles north of the city limits of Laurel. The land was described as NW¼ of NE¼, N½ of NW¼ of Sec. 14, NE¼ of NE¼ of Sec. 15, and approximately 20 acres in the SE¼ of NW¼ of Sec. 14, being that part of the 40 lying north and east of a line beginning a short distance north of the southeast corner of said 40 and running to a point a short distance south of the northwest corner, all in Township 9 N, Range 11 E. The present U. S. Highway 11 ran through the southern part of the twenty acres aforesaid, and northeasterly across the southeastern part of the NW¼ of NE¼. A road by which the Howards had access to their residence on the above land ran from the west boundary line of present U. S. Highway northwesterly along the southwest boundary of the twenty acres aforesaid.

On the eastern part of their lands between the old highway and the right-of-way to be acquired was a high-power line of Mississippi Power Company. West of the highway was the main line of Southern Railway Company, and farther west was Tallahala Creek. The lands to be condemned extended from the northwest portion of the twenty acre tract in a northeasterly direction across the NE¼ of NW¼ and across the northwest corner of the NW¼ of NE¼. At the south end the right-of-way for the interstate road was approximately 376 feet wide, and the frontage road to the west thereof was about 84 feet wide. At the north end, because of the angle at which it lay, the right-of-way was approximately 500 feet wide, and for the frontage road, 117.8 feet.

The road leading from U. S. Highway 11 to the residence of the appellees was the only entrance and exit and was severed by the new right-of-way. Their lands are used for row crops, cattle raising, and as a tree farm. There are five ponds on the property, ranging from one-half acre to approximately four acres in size. There are three tenant houses, all occupied, one of which was taken. There are also a number of barnes, outhouses and sheds customarily found on farms. Other than the tenant house, there was also taken a water well at that house, a hog pen, one small pond, a portion of pasture land, a wooded area, and some open land which had recently been planted in young pines.

It is shown that at the south end of the right-of-way and along the entry road aforesaid there is a water pipe leading across the right-of-way which supplies water from a house on one side of the right-of-way to a house on the other side, which will have to be abandoned. The entry road will be blocked at both ends of the right-of-way and the only entrance to the Howards' property will be by traveling in a northeasterly direction along the east side of the right-of-way, crossing under a bridge some distance north, and then down the frontage road on the

west side of the right-of-way, a distance of approximately four miles, making a round trip of eight miles from lands east of the new highway to the home of the defendants on the west side. The new highway will divide the farm so that approximately 55 acres will lie east of the new highway and 102 acres west thereof.

The only assignment of error which we think needs discussion arises from the following facts. The witness Warren testified that he was an experienced real estate man and appraiser. At the request of the landowners, he valued this property and testified thereto. He valued the property before the taking at $138,060, after the taking at $82,327, making the damages $55,733. On cross-examination, he stated that it was approximately three-fourths of a mile from Highway 11 to the first tenant house. The map shows this distance to be less than one-fourth of a mile. When asked what kind of a tenant house, he said it was just "a regular tenant house"; that it had approximately 500 square feet in it, but he declined to give the value thereof, saying that he did not appraise the individual house but appraised the property as a whole. He was asked if he thought it was worth $1,000, he said he "wouldn't say the house was worth any dollars — as a part of the whole is the only way I would put it." On being again asked and the answer being insisted upon, he said it "may be worth more than $1,000 — I don't know exactly what it is worth." After considerable questioning, he reluctantly answered that the house would be worth about $3200.

Then the appellant's attorney asked: "Mr. Warren, you have some notes there before you, do you mind my seeing these notes?" Attorneys for the appellees objected and the witness answered, "No, you can't see these notes." The attorney again asked to see the notes, but the witness stated they were not his property, they belonged to the Howards, although they were in his handwriting and he was referring to them while testifying.

The witness was asked to tell the jury if he objected to the attorney seeing his notes, and he said, "I don't think he has any right to see my notes — I haven't seen his notes." He was asked if "you have anything to hide, Mr. Warren?" and he answered, "Mr. Graves, no do you?" He was then asked to read the notes to the jury, but his answer was, "Some of these notes don't — it's my way of making an appraisal — I've got to write something down."

The attorney repeatedly asked questions about various items or parts of the property, but the witness was reluctant and would not answer some of the questions. Finally, the following exchange took place:

Q. May I see your notes there, Mr. Warren?
A. No, sir, you may not.
Q. You have a piece of paper there that shows your before value and your after value?
A. Yes, sir.
Q. Your difference?
A. Right.
Q. Is it in your file?
A. Right.
Q. May I see it?
A. Do I have to show it to him, Judge?
BY MR. ALLEY: No, sir.
BY THE COURT: That's up to counsel.
BY MR. ALLEY: We object.
BY THE COURT: I don't — I wouldn't require him to show his notes over objection, because as I understand it he makes notes there and is refreshing his memory from it in testifying from it, and the court's ruling is that counsel has no right to require him to show them.

■■ ■ This ruling of the court was in error. In 58 Am. Jur. *Witnesses* § 601 (1948), it is stated:

The opposing party or counsel has the right, on proper demand, to inspect and use for purposes of

cross-examination any paper or memorandum which is used by a witness while on the stand for the purpose of refreshing his memory upon the matters as to which he is testifying, and which in fact does tend to refresh his memory. The opposing party is accorded this right in order that he may ascertain whether the paper or memorandum used has any legitimate tendency to bring the fact in controversy to the mind of the witness, and in order that he may be in a position to cross-examine as to the testimony given and thereby test the candor and integrity of the witness. . .

It is true that this statement of the rule requires proper application to the court for examination of the paper. However, in this case the court stated that it would not require him to show his notes over objection; therefore, another application directly to the court would have been useless. The attorney for the petitioner or the commission should have been given the right to examine these notes, and if he desired, examine or cross-examine the witness about same. Although ordinarily this would be reversible error, in this particular case we think Rule 11 of the Court is applicable, which is as follows:

No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice. (Miss. Rules 11 (1964).

This rule has been applied many times by this Court, and a list of many decisions where same was applied appears in the annotation of the Mississippi Rules in the March 1965 issue of the Mississippi Law Journal.

██ ██ We cannot say that the refusal to permit the attorney for the Commission to see said notes and cross-

examine the witness as to same resulted in a miscarriage of justice.

Mr. Moore, a witness for the Commission, appraised the before taking value of the property at $44,440, the after taking value at $30,140, the damage at $14,300. Mr. Morgan, the second witness for the Commission, placed the before taking value at $43,300, the after taking value at $28,600, the damages at $14,700. Mr. Warren, the witness heretofore mentioned, placed the before taking value at $138,060, the after taking value at $82,327, the damages at $55,733. Mr. Parrish, the other witness for the landowners, placed the before taking value at $155,219.60, the after taking value at $87,469.40, the damages at $67,750.20.

The jury viewed the property and fixed the damages at $25,500. Their verdict is less than twice the amount of the appraisals by the state highway appraisers, and it is less than forty percent of the appraisal by the landowners' evidence.

There is no question that the landowners were damaged, and in view of all the circumstances, we are unable to say that this verdict is excessive. It is more in line with verdicts heretofore approved by this Court, including particularly the case of Smith v. State Highway Commission, 252 Miss. 883, 174 So. 2d 375.

In view of the action of the jury in disregarding the high figures mentioned by the witness Warren and the witness Parrish, we are unable to say that the refusal of the court to permit the Commission to examine the notes made by the witness Warren and used by him during his testimony was harmful or resulted in damage to the Commission. Therefore, we affirm the case.

Affirmed.

*Lee, C. J., and Rodgers, Patterson and Smith, JJ.,* concur.